and Mazzone made the following additional misrepresentations and omissions to Frenkel, (i) that the XIOM technology had the most unique and proprietary spray guns and powder in the marketplace, (i) that Zimbler was traveling to New York, Boston, Baltimore and New Hampshire to commence distribution of the Xiom Technology, and (iii) Mazzone's failure to disclose that in fact, upon information and belief, the investment or portion thereof was being illegally transferred to areas of Latin America by his girlfriend for his and possibly her own ill-gotten gain.

37.    On March 11, 2010, the then Chief Executive officer of EIHC, Parrish, was issued by Frenkel a written default notice demanding repayment of the Convertible Note in the principal amount of $500,000 plus accrued and unpaid interest totaling at least $21,759.69.

38.    Upon information and belief, at the time of the issuance of the Convertible Note to Frenkel Defendants XIOM, Zimbler and Mazzone were well aware that they never intended to honor any form of repayment but rather, as described more fully herein, divert the funds out of XIOM for their own ill-gotten gain.

39.    Incredibly, following XIOM's default under the Convertible note, Zimbler sent to Frenkel an email on April 16, 2010 expressing his dissatisfaction with the XIOM and by extension Equisol and its management, stating that it was not the Company Parrish described and indirectly appearing to continue induce Frenkel's continued involvement in EIHC despite the fraudulent inducement in obtaining Frenkel's initial $500,000 investment in the first instance.

**The Issuance of the Fraudulent Convertible Exchangeable Note to Finocchiaro**

40.     On or about May 25, 2007, XIOM, Mazzone and Zimbler offered Finocchiaro a seven percent (7%) Convertible Exchangeable Note in the aggregate amount of $120,000 (the "Convertible Exchangeable Note"). The Convertible Exchangeable Note was scheduled to mature on April 1, 2012. Upon information and belief, the Convertible Exchangeable Note also provided in relevant part, that, "The Company will promptly and punctually pay to Note Holder or their nominee the interest on any of the Convertible Exchangeable Note held by the Note Holder without presentment of the Note.

41.     The Convertible Exchangeable Note accrued interest at seven percent (7%), which interest rate would increase fifteen percent (15%) in the event the Convertible Exchangeable Note was not repaid by September 30, 2008. Interest accrued as of February 3, 2010 in the aggregate amount of at least $30,900.

42.     In addition, and in furtherance of the fraudulent scheme on the Defendants' XIOM's, Mazzone's and Zimbler's part to have Finocchiaro enter into the Convertible Exchangeable Note, the Convertible Exchangeable Note offered warrant coverage at varying exercise prices.

43.     On October 23, 2008, Finocchiaro wrote to Defendant Mazzone electing to accelerate the maturity date associated with the Convertible Exchangeable Note in the principal amount of $120,000 plus accrued and unpaid interest.

**The Issuance of the Fraudulent EIHC Shares to Finocchiaro**

44.     Upon information and belief, on or about January 2010, Parrish represented to Finocchiaro that unless he converted his Convertible Exchangeable Note along with all unpaid and accrued interest all his investment would be lost since, according to Parrish, he intended to bankrupt XIOM without explaining the reasons for the intended bankruptcy. As a result of Parrish's statements Finocchiaro believed he had no choice but to convert the entirety of his Convertible Exchangeable Note on approximately December 2, 2012 into 603,600 shares of EIHC stock.

45.     Upon information and belief, at the time of the issuance of the Convertible Exchangeable Note and forced conversion of the Convertible Exchangeable Note Parrish, XIOM, Zimbler and Mazzone were well aware that they never intended to honor any form of repayment, and knew or should have known that the EIHC shares issued as a result of the forced conversion would ultimately become worthless. Upon information and belief, Defendants' conduct was all a part of a carefully orchestrated scheme to avoid repayment to Finocchiaro and divert the funds out of XIOM for their own ill-gotten gain.

46.     Plaintiff Finocchiaro lost his entire investment associated with the Convertible Exchangeable Note, and EIHC shares including as of September 30, 2013 approximately $98,900.00 in accrued and unpaid interest.

## The Issuance of the Fraudulent XIOM private offering to Finocchiaro

47.     Upon information and belief, pursuant to a private placement memorandum prepared by Michael Krome, Esq. (who, upon information and belief, is currently serving a prison sentence) issued in November 2009 ("PPM") by Xiom, and in furtherance of Defendants XIOM's, Mazzone's and Zimbler's fraudulent effort to obtain additional investments from various unsuspecting individuals, solicited an additional $50,000 from Finocchiaro all the while willfully and unlawfully knowing that such PPM contained numerous misrepresentations and omissions as described herein.

48.     Upon information and belief, as part of Defendants XIOM, Mazzone and Zimbler's continued scheme to fraudulently induce Finocchiaro to invest in the PPM, XIOM, Mazzone and Zimbler issued to him 200,000 shares of XIOM shares on or about March 9, 2010.

49.     Plaintiff Finocchiaro lost all of his investment associated with the PPM due to the material misrepresentations and omissions contained therein.

## Plaintiff Finocchiaro's numerous trading losses in the open market with EIHC.

50.     Upon information and belief, Finocchiaro between approximately 2008 and 2012 purchased in the open market $168,000 worth of shares of XIOM and EIHC.

51.     During the relevant period in question, EIHC and XIOM engaged in numerous reverse splits of the open market share purchases essentially devaluing the shares to

nothing, which illicit conduct resulted in Finocchiaro losing his entire investment totaling in the aggregate over $168,000.

52.     Upon information and belief, Finocchiaro would have never engaged in any of the above described open market share purchases had he known of Defendants Parrish and EIHC's undisclosed scheme to essentially "tank" the value of the stock for their own ill-gotten gain.


**Plaintiff Famoso's numerous trading losses in the open market with EIHC and SET**


53.     Upon information and belief, Famoso between approximately January 2009 and November 2009 purchased in the open market $41,000,000 worth of shares of EIHC, and between May 2009 and June 2010 approximately $11,000,000 shares in the open market of SET.

54.     During the relevant period in question, EIHC and SET engaged in excess of 30 reverse splits of the open market share purchases described in paragraph essentially devaluing the shares to nothing, which illicit conduct resulted in Famoso losing his entire investment totaling in the aggregate over $52,000.

55.     Upon information and belief, Famoso would have never engaged in any of the above described open market share purchases had he known of Defendants Parrish, EIHC and SET's undisclosed scheme to essentially "tank" the value of the stock for their own ill-gotten gain.